## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| GLOBAL ENVIRONMENTAL RESTORATION INC | CASE NO. 6:20-CV-00547 |
| VERSUS | JUDGE JUNEAU |
| SHORE CORP | MAGISTRATE JUDGE WHITEHURST |

### REPORT AND RECOMMENDATION

Before the Court, on referral from the district judge, is the Motion to Dismiss Pursuant to Rule 12(b)(2) and Rule 12(b)(3) [Doc. 10], filed by defendant Shore Corporation ("Shore"). In its motion, Shore seeks dismissal of the instant matter on grounds this Court lacks personal jurisdiction over it, and on grounds venue in this Court is improper. The motion is opposed by the plaintiff, Global Environmental Restoration, Inc. ("GER") [Doc. 13], and Shore filed a Reply brief [Doc. 21]. For the reasons that follow, the undersigned recommends that the motion to dismiss be DENIED at this time, without prejudice to Shore to seek enforcement of the alleged forum-selection clause in the proper manner.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

The instant lawsuit arises out of a failed business relationship between

defendant Shore and GER. GER is a wholesaler, retailer, and distributor of specialty disinfection, sanitation, and odor elimination products, and defendant Shore is a chemical manufacturer that manufactures products for GER to distribute and sell. GER's product line includes certain chlorine dioxide (CLO2) formula products (Nok-Out™ brand), including Sniper™, a Level IV-EPA-approved sanitizer and hospital-grade disinfectant. In its complaint, GER alleges that because Sniper™ is effective in killing the coronavirus, demand for Sniper™ since the onset of the coronavirus epidemic has been extremely high, and GER has been unable to keep up with demand by hospitals and other medical providers for this essential product. It is alleged that plaintiff GER is the successor to a company called Amazing Concepts. In its complaint, GER alleges that Amazing Concepts and Shore began their business relationship in the mid 1990's, with Shore manufacturing disinfectant and deodorizing products which it developed exclusively for Amazing Concepts. Amazing Concepts marketed and sold the products under the brand name Nok-Out™ as an odor eliminator and first registered Nok-Out™ with the Environmental Protection Agency ("EPA") as a disinfectant. GER alleges that Amazing Concepts had, with the knowledge and permission of Shore, expended substantial time and resources registering this product with the EPA, because Shore did not have the money or the

marketing ability to invest in and market an EPA-registered product.

According to GER, in early 2014, Shore and Amazing Concepts entered into two contracts memorializing their business relationship moving forward. These contracts governed the ownership, manufacture, and sale of all Shore formulations of the ClO2 product distributed by Amazing Concepts under its Nok-Out™ brand, as well as related products, including GER's SNiPER™ brand of EPA registered disinfectant. Under the first contract, Shore and Amazing Concepts entered into a Manufacturing and Hold Harmless Agreement ("Manufacturing Agreement"), dated January 13, 2014, "to formalize the parties' arrangements and obligations for future business involving the development, purchase and sale of products registered with the EPA." Amazing Concepts permitted Shore to manufacture Shore's ClO2 products using Amazing Concepts' EPA registrations (including GER's subregistration), and Shore agreed to continue to manufacture for Amazing Concepts the products Amazing Concepts had registered with the BPA.     Under the second contract, Shore and Amazing Concepts entered into a "Product and Production Agreement and Purchase of Scheduled Products" Agreement (the "Product Agreement"), dated March 13, 2014. This Agreement recognized that while Amazing Concepts had obtained, and owned, EPA registrations for some of the products, Shore retained

the ownership of the formulations for these products. Under the Product Agreement, Shore sold these products and formulations to Amazing Concepts: "Shore hereby grants and transfers to Amazing exclusive rights, title and interest in the" specified products, subject to a payment to Shore of $400,000, to be paid under a certain formula over five years." The Product Agreement further provided that Shore would place in escrow, until the final payment had been made, the formulation for the products being sold and the related manufacturing information, so that this information could be obtained by the purchaser after payment was complete. GER alleges that the Product Agreement encompassed products that were EPA-registered and those that were not. GER references the "Scheduled Products," listed in the Product Agreement, to which Shore sold all "rights, title and interest;" this list included Sniper™ as well as Nok- Out™ and other related unregistered products.

GER alleges that the Product Agreement only permitted Shore to "manufacture, package and ship" the Scheduled Products "[b]ased on written purchase orders received from Amazing Concepts;" that is, the contract provided that Shore had sold the formulations for the specified products to Amazing Concepts and could only manufacture and sell the specified products for Amazing Concepts, and not independently to any third patties. The Product

Agreement further provided that it was assignable by either party upon a sale of all or substantially all of its assets. GER alleges that this provision was particularly important, as GER had been involved with Amazing Concept's registrations of the EPA-licensed products (as a sub-licensee), and it was contemplated that GER would acquire Amazing Concepts and step into its shoes under this agreement.

By agreement dated December 14, 2014, GER purchased substantially all of the assets of Amazing Concepts, and the Amazing Concepts EPA registrations for the products were transferred to GER. GER alleges that Shore knew of this acquisition and approved and continued to do business with GER (in place of Amazing Concepts) in the following years. GER alleges that Shore has acknowledged the sale on multiple occasions, referencing in writing the "agreement with [Amazing], and by way of acquisition, [GER], ... that certain formulations are being purchased over a several year period for a specified amount." GER further contends that Shore has also accepted payment from GER of the $400,000 due under the Product Agreement since roughly January 2015.

GER contends that Shore and GER entered into a Manufacturing Agreement effective December 12, 2014, that is nearly identical to the one between Amazing Concepts and Shore. The copy of this Agreement that has been attached to GER's complaint in this matter is signed only by Alan

Campbell, President of GER. The signature of Stuart Hammerschmidt, President of Shore, is not found on the document.[1]

GER contends that Shore and GER did business together from 2015 to 2020 without significant incident. GER alleges that the time in which GER was to exclusively purchase the products from Shore and pay the $400,000 purchase price for the product formulations was extended by the parties to March 2020, and that Shore acknowledged this fact, in writing, in the following January 27, 2020 email from Stuart Hammerschmidt to Alan Campbell:

> Since our agreement has been verbally extended beyond the termination date (March 13, 2019), and the original agreement was with Amazing Concepts, I think it is in our best interests to draft an addendum to cover both parties. If you agree, I will have one sent over so you can review. If you could also send me your purchase agreement of Amazing Concepts (with the dollar amounts blacked out if you wish), that would be helpful in drafting a new agreement.[22]

GER alleges that it made the final payment under the Product Agreement in March 2020, but that within a week of receiving this payment, Shore contacted GER to indicate its belief that GER had "breached" the prior agreement by failing to pay over $300,000 by March 2019, even though Shore acknowledged that GER

---

[1] *See* Manufacturing Agreement, attached as Exhibit 3 to GER's Complaint.

[2] *See* January 27, 2020 email, attached as Exhibit L to the Declaration of Alan Campbell, attached as Exhibit 1 to GER's Complaint.

paid the full amount owed by the extended due date of March 2020. Shore argued that it retained ownership of the formulations of the products that GER alleges it has paid for in full.

GER argues Shore refused to ship to GER significant quantities of product it already manufactured pursuant to purchase orders GER submitted and Shore accepted, but later agreed to release products manufactured for GER and permitted GER to place further orders. GER alleges that Shore continues to maintain that GER breached the contracts and refuses to release the formulas and manufacturing processes that GER argues it purchased.

According to GER, Shore has demanded that GER agree to an additional five-year exclusive agreement, that GER agree to pay Shore an exorbitant price to manufacture these products going forward, and that Shore be permitted to sell GER's products directly to its own customers. GER argues that Shore did all these things at the beginning of the Covid-19 pandemic, knowing that there was unparalleled demand from the hospitals and doctors that purchase GER's products, who would not be able to find another supplier.

GER filed the instant lawsuit against Shore on April 30, 2020, asserting claims for breach of contract, conversion, and violations of the Louisiana Unfair Trade Practices Act. In the instant motion to dismiss, Shore seeks dismissal of the instant lawsuit on grounds it is not subject to the personal jurisdiction of this

Court, and further, on grounds venue is not proper in this Court.

## II.    LAW AND DISCUSSION

### A. Personal Jurisdiction

"Where a defendant challenges personal jurisdiction, the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists." *Luv N'care, Ltd. v. Insta-Mix, Inc.,* 438 F.3d 465,469 (5th Cir. 2006). The plaintiff bears the burden in the instant case of establishing the personal jurisdiction of this Court over Shore.

When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the plaintiff need only make a *prima facie* showing of personal jurisdiction. *Guidry v. US. Tobacco, Co., Inc.,* 188 F.3d 619,625 (5th Cir. 1999). "The allegations of the complaint, except insofar as controverted by opposing affidavits, must be taken as true, and all conflicts in the facts must be resolved in favor of the plaintiffs for purposes of determining whether a prima facie case for personal jurisdiction has been established." *Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162, 1165 (5th Cir. 1985). "In determining whether personal jurisdiction exists, the trial court is not restricted to a review of the plaintiff's pleadings." *Jobe v. ATR Mktg., Inc.,* 87 F.3d 751, 753 (5th Cir. 1996). The Court may consider matters outside the complaint, including affidavits, interrogatories, depositions, or any combination

of the recognized methods of discovery. *Id.*

Jurisdiction over a non-resident defendant is proper when (1) the defendant is amenable to service of process under the long-aim statute of the forum state and (2) the exercise of personal jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment. *Dalton v. R&W Marine, Inc.,* 897 F.2d 1359, 1361 (5th Cir. 1990). In the instant case, "these two inquiries merge into one because Louisiana's long-arm statute permits service of process coterminous with the scope of the due process clause." *NuovoPignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir. 2002) (reversed in part on other grounds), *citing* La. R.S. 13:3201(8). "The Due Process Clause of the Fourteenth Amendment protects a corporation, as it does an individual, against being made subject to "the binding judgments of a forum with which it has established no meaningful 'contacts, ties, or relations.'" *Pervasive Software Inc. v. Lexware GmbH & Co. KG,* 688 F.3d 214,220 5th Cir. 2012).

A court may exercise personal jurisdiction over a non-resident defendant when "(l) that defendant has purposefully availed itself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state and (2) the exercise of personal jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.'" *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir. 1999) *quoting Int'! Shoe,* 326 U.S. at 316.

"Minimum contacts" can be established through specific jurisdiction or general jurisdiction. *Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208,215 (5th Cir. 2000). Specific personal jurisdiction exists (1) when a defendant has purposely directed its activities, or availed itself of the privileges of conducting its activities, toward the forum state; (2) the controversy arises out of or is related to those activities; and (3) the exercise of jurisdiction is fair, just, and reasonable. *Nuovo Pignone, SpA,* 310 F.3d 378, *citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). General personal jurisdiction exists when the defendant has engaged in continuous and systematic activities in the forum state, regardless of whether such activity is related to the plaintiffs cause of action. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408,415 (1984).

"If a nonresident defendant has sufficient related or unrelated minimum contacts with the forum, we must then consider whether the 'fairness' prong of the jurisdictional inquiry is satisfied." *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir. 1994). The fairness inquiry is determined by analyzing several factors: (1) the burden upon the nonresident defendant of litigating in the forum state; (2) the interests of the forum state; (3) the plaintiffs interest in securing relief; (4) the judicial system's interest in obtaining an efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive

social policies. *Bullion v. Gillespie,* 895 F.2d 213, 216 n.5 (5th Cir. 1990).

### 1. General personal jurisdiction

General personal jurisdiction exists when the defendant has engaged in continuous and systematic activities in the forum state, regardless of whether such activity is related to the plaintiffs cause of action. *Johnston v. Multidata Sys. Int'l Corp.,* 523 F.3d 602, 609-10 (5th Cir. 2008), *citing Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415 (1984). In *Goodyear Dunlop Tires Operations,* S. *A. v. Brown,* 131 S. Ct. 2846, 2851 (2011), the court explained, "[a] court has general jurisdiction over a foreign corporation when its "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." In *Daimler AG v. Baumer,* the Supreme Court clarified the "at home" standard described in *Goodyear,* reasoning that companies should not be forced to defend themselves in jurisdictions where they may have a presence, or even where they conduct significant amounts of business, yet are not "at home." 134 S. Ct. 746, 760-62 (2014). "The continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Johnston v. Multidata Sys. Int'! Corp.,* 523 F. 3d 602, 609 (5th Cir. 2008). *See also Submersible Sys., Inc. v. Perforadora Cent., SA.,* 249 F.3d 413, 419 (5th Cir.2001) (citation omitted) ("the 'continuous and systematic contacts test is a difficult one to meet, requiring extensive

contacts between a defendant and a forum."'). "[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction ...." *Johnston,* 523 F.3d at 610, *citing Revell v. Lidov,* 317 F.3d 467, 471 (5th Cir.2002) (citations omitted). "Random, fortuitous, or attenuated contacts are not sufficient to establish jurisdiction." *Johnston,* 523 F.3d at 610, *citing Moncrief Oil Int'! Inc. v. OAO Gazprom,* 481 F.3d 309, 312 (5th Cir.2007) (citation omitted).

"General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." *Access Telecom, Inc. v. MCI Telecomms. Corp.,* 197 F.3d 694, 717 (5th Cir.1999). The contacts must be reviewed in toto, and not in isolation from one another. *Holt Oil & Gas Corp. v.* Harvey, 801 F.2d 773, 779 (5th Cir.1986); *see also Religious Tech. Ctr.,* 339 F.3d at 374 ("None of the activities individually constitutes a substantial or meaningful contact with Texas, Texas law, or Texas residents, and certainly considered in toto they fail to amount to continuous and systematic contact with Texas such that general jurisdiction is created."). But vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction. *See Gardemal v. Westin Hotel Co.,* 186 F.3d 588,596 (5th Cir.1999).

12

In support of its motion, Shore attaches the Affidavit of Stuart G. Hammerschmidt, President of Shore, who attests that Shore is a Pennsylvania business corporation.[3]  Hammerschmidt attests that Shore's principal place of business is located in Ambridge, Pennsylvania and states that Shore has not now, nor has it ever been, organized, existing, or registered under the laws of Louisiana. Hammerschmidt attests that Shore is not authorized to do business in Louisiana, does not maintain an agent for service of process in Louisiana, and has no subsidiary company doing business in Louisiana. Shore has never initiated any lawsuit in Louisiana. Hammerschmidt attests that Shore has never employed someone in Louisiana, nor does Shore have an office, bank account, or own property in Louisiana.

GER does not appear to challenge Shore's argument that this Court lacks general jurisdiction over Shore, focusing its arguments on the issue of specific jurisdiction.  Furthermore, after a review of the record, the undersigned finds that Shore does not have continuous or systematic activities or a relationship with the State of Louisiana giving rise to general personal jurisdiction. Therefore, to the extent that it is being argued that general jurisdiction exists, this

---

[3] *See* Affidavit of Stuart G. Hammerschmidt, attached as Exhibit 1 to Shore's motion to dismiss.

argument is without merit.

## 2. Specific personal jurisdiction

Specific personal jurisdiction exists (1) when a defendant has purposely directed its activities, or availed itself of the privileges of conducting its activities, toward the forum state; (2) the controversy arises out of or is related to those activities; and (3) the exercise of jurisdiction is fair, just, and reasonable. *Nuovo Pignone, SpA,* 310 F.3d 378, *citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). As the Court stated in *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (U.S. 2011):

> Specific jurisdiction . . . depends on an "affiliatio[n] between the forum and the underlying controversy," principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation. In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of "issues deriving from, or connected with, the very controversy that establishes jurisdiction."

(internal citations omitted).

With respect to specific jurisdiction, Shore argues it did not purposely direct its activities toward Louisiana and the claims against Shore do not arise out of or result from Shore's forum-related contacts. Shore argues it has never marketed or advertised its products in Louisiana and did not initiate negotiations with GER to enter into an agreement for GER to distribute products

14

manufactured by Shore. Shore argues it has never directly shipped any of the products purchased by GER to Louisiana, and that no contract between Shore and GER was ever negotiated or signed in Louisiana. Shore argues that that GER made all decisions and arrangements for the product shipments from the Shore Corporation facility in Pennsylvania, in which GER took delivery and ownership of Shore's products once those products left Shore's shipping warehouse. Because of this, Shore argues it neither purposely directed its activities toward Louisiana, nor does the cause of action arise out of or result from Shore's forum-related contacts.

Under the Fifth Circuit's analysis, this Court must first determine "whether the defendant has minimum contacts with the forum state, *i.e.,* whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there." *Georgia Mobile Dental, LLC v. Napper,* 2018 WL 6037527, at *3 (M.D. La. Nov. 16, 2018), *citing Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir. 2002) (abrogated on other grounds) and *Hanson v. Denckla,* 357 U.S. 235, 250-251 (1958). This "minimum contacts" or "purposeful availment" inquiry is fact intensive. No one element is decisive and the number of contacts with the forum state is not, by itself, determinative. *Luv N' care, Ltd. v. Insta-Mix, Inc.,* 438 F.3d

465,470 (5th Cir. 2006). A single, substantial act directed toward the forum can support specific jurisdiction, *ASARCO, Inc. v. Glenara,* Ltd., 912 F.2d 784, 786 (5th Cir. 1990), but even multiple contacts, if "[r]andom, fortuitous, or attenuated... are not sufficient to establish jurisdiction." *Moncrief Oil, Int'l, Inc. v. OAO Gazprom,* 481 F.3d 309,312 (5th Cir. 2007). What is significant is whether the contacts suggest that the nonresident defendant purposefully availed himself of the privileges or benefits of the laws of the forum state. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980), *citing Hanson* 357 U.S. at 251, 254; *Hydrokinetics, Inc. v. Alaska Mech., Inc.,* 700 F.2d 1026, 1028 (5th Cir. 1983), *cert. den.,* 466 U.S. 962 (1984).

The jurisprudence shows that a nonresident defendant's communications directed to a plaintiff in Louisiana can satisfy minimum contacts if (1) they are directed toward creating "continuing obligations" between the defendant and residents of the forum and (2) the dispute arose from those ties. *Georgia Mobile Dental, LLC v. Napper,* 2018 WL 6037527, at *4 (M.D. La. Nov. 16, 2018), *citing Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir. 2002) (abrogated on other grounds) and *Hanson v. Denckla,* 357 U.S. 235, 250-251 (1958).

In cases involving alleged breaches of contracts between a forum-state

party and an out-of-state party, courts have addressed the sufficiency of contacts to establish specific jurisdiction. For example, in *Georgia Mobile,* a lawsuit involving a failed business relationship between a Tennessee defendant and Louisiana plaintiff, the court explained:

> ... As long as a commercial actor's efforts are "purposefully directed" toward residents of the state in question, courts have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.
>
> Nonetheless, "merely contracting with a resident of the forum state does not establish minimum contacts." "A contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. ***It is these factors-prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing-that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."***
>
> Although a single act, such as a telephone call or mailing a letter, can be sufficient to establish minimum contacts, precedent is clear that communications alone are insufficient when "the communications with the forum did not actually give rise to [the] cause of action." ***Rather, when communications relating to conducting business are the only contacts, courts generally require some type of "continuing obligations" between the defendant and residents of the forum, such as is found in an ongoing business relationship, to find that the defendant availed himself of the privilege of conducting business in the forum.*** Only then, "because his activities are shielded by 'the benefits and protections' of the forum's laws, it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well."

2018 WL 6037527 at *4 (internal citations omitted) (emphasis added).

Here, as pointed out by Shore in its reply brief, GER cites this Court to numerous cases, outlining different factual scenarios wherein courts have found specific jurisdiction on the basis of contractual negotiations conducted through phone calls or emails, but fails to apply those cases to the specific facts of *this* case or otherwise demonstrate *how* Shore purposely availed itself of the Louisiana forum. Notwithstanding the foregoing, this Court has reviewed the emails referenced in the Declaration of Alan Campbell, and from a review of these emails, it appears that GER is arguing that it had a long-standing business relationship with Shore, with continuing communications and negotiations, which occurred from the parties' respective business headquarters. GER also appears to be arguing that Shore's continued contacts with GER in Louisiana evidence a purposeful availment of the benefits of the Louisiana forum. Shore objects to all of the emails referenced by GER, primarily arguing the emails do not establish "purposeful contacts of Shore directed toward Louisiana."

As an initial matter, the undersigned notes that Shore initially contracted with Amazing Concepts, a Michigan company, and did not enter into a written contract with GER. GER purchased the assets of Amazing Concepts in December 2014 and began dealing with Shore as the successor in interest to Amazing Concepts at that time. Although GER executed a contract between GER and

18

Shore, the copy of that agreement that has been provided to the Court is not signed by Shore. Nevertheless, the emails provided by the parties show that Shore continued to do business with GER in the absence of a written contract. Given the foregoing, it was not until December 2014 that Shore could be said to be purposely availing itself of the Louisiana forum. For this reason, the undersigned will consider the communications between the parties beginning in December 2014.

On January 21, 2015, Stuart Hammerschmidt of Shore emailed Alan Bud Campbell, President of GER, and provided him with information about how much Amazing Concepts had paid toward the product formula purchase in December 2014, and how much GER had been billed for the product formula purchase since their first order invoice on December 22, 2014.[4] This email evidences Shore's continuity of business dealings with GER in the days immediately after GER's purchase of Shore's assets. Several emails were exchanged internally among Shore employees in January 2015, all relating to the EPA registration process for certain products.[5] None of the emails impacts the inquiry before the Court.

---

[4] *See* Exhibit F attached to the Declaration of Alan Campbell, Exhibit 1, which is attached to GER's opposition brief, Doc. 13.

[5] *See* Exhibits G, H, and J, attached to the Declaration of Alan Campbell, Exhibit 1.

On February 26, 2019, Hammerschmidt sent an email to Campbell, attaching a purchase summary for GER. The email goes on to state, "Since the agreement ends on March 14, plans moving forward?" Thus, in this email, Shore specifically invites discourse concerning the continuing business relationship between the parties. On January 27, 2020, Hammerschmidt again emailed Campbell, this time writing:

> Since our agreement has been verbally extended beyond the termination date (March 13, 2019), and the original agreement was with Amazing Concepts, I think it is in our best interests to draft an addendum to cover both parties. If you agree, I will have one sent over so you can review. If you could also send me your purchase agreement of Amazing Concepts (with the dollar amounts blacked out if you wish), that would be helpful in drafting a new agreement.[6]

In this email, Shore again discusses and contemplates the continuing business relationship between the parties and suggests that formalizing an agreement is advisable. On February 27, 2020, Campbell emailed Hammerschmidt, pointing out that he does not have a copy of the Agreement between Shore and GER that is signed by Shore and indicating his assumption that Hammerschmidt had, in fact, signed the Agreement and simply neglected to return a signed copy to Campbell.

---

[6] *See* January 27, 2020 email, attached as Exhibit L to the Declaration of Alan Campbell, attached as Exhibit 1 to GER's Complaint.

On April 2, 2020, Shore's attorney, Jaime Doherty, sent a letter to Campbell, wherein Doherty explained that Hammerschmidt had sent several agreements that had been "updated," but that Campbell had not executed them. The letter goes on to state:

> It is Shore's goal to reach a mutually beneficial and workable agreement, with a pricing structure that will accommodate both parties' interest. However, the pricing structure you have proposed is not in keeping with industry standard.
>
> [ ... ]
>
> I understand that you have nine (9) separate purchase orders that have been received into Shore Corporation within the last 48 hours. I also understand that four (4) of those orders were submitted yesterday, April 1, 2020, with the pricing left blank. Five (5) additional orders were received today, with pricing at the level you proposed, which was rejected by Shore Corporation. Two (2) of the original four (4) orders have shipped from Shore. [GER] will be invoiced for those shipments at the parties' previously agreed-upon pricing arrangement, pursuant to the prior agreement.
>
> The remaining seven (7) orders will not be honored unless and until a Supply Agreement is in place and/or the parties have substantial agreement upon all material terms, including pricing.[7]

In *Colwell Realty Investments, Inc. v. Triple T Inns of Arizona, Inc.,* 785 F.2d 1330, 1334 (5th Cir. 1986), the Fifth Circuit explained:

> . . . merely contracting with a resident of the forum state is

---

[7] *See* April 2, 2020 letter from Jaime Doherty to Alan Campbell, attached as Exhibit P to Declaration of Alan Campbell.

insufficient here to subject the nonresident to the forum's jurisdiction. *See Burger King,* 471 U.S. at--, 105 S.Ct. at2185; *Stuart,* 772 F.2d at 1192-93. Thus, Colwell Realty's state of incorporation, by itself, is insufficient to confer jurisdiction over the nonresident Triple T. ***Rather, in deciding whether Triple T's consent to Colwell Realty's substitution subjected Triple T to jurisdiction in Texas, the Court must "look to the factors of prior negotiations, contemplated future consequences, terms of the contract, and the parties' actual course of dealing to determine whether [the nonresident defendant] purposefully established minimum contacts with the forum."*** *Stuart,* 772 F.2d at 1193 (emphasis added). *See Burger King,* 471 U.S. at--, 105 S.Ct. at 2185-86.

(emphasis added). Additionally, of special import to "doing business" under the long-arm statute is whether the defendant "reached out" to the forum resident to create continuing business relationship, to wit:

> [A]11 of the formal negotiations took place via telephone and written correspondence between the two parties from their respective headquarters. In other words, APA cannot really dispute the fact that, during the course of negotiations, APA specifically and deliberately "reached out" to a Texas corporation by telephone and mail with the deliberate aim of entering into a longstanding contractual relationship with a Texas corporation.

*Cent. Freight Lines Inc. v. APA Transp. Corp.,* 322 F.3d 376,382 (5th Cir. 2003).

Here, the April 2, 2020 letter from Shore's counsel to GER evidences not only prior negotiations, but also *"contemplated* future consequences, terms of the contract, and the parties' actual course of dealing... " in that it discusses previously- placed orders, the pricing structure in place as well an as-yet-to-be-

determined pricing structure, and the consequences of GER not executing the contract drafted by Shore. Moreover, in each of these communications, Shore was "reaching out" to GER to formalize and finalize the parties' business relationship.

Additionally, it is clear that GER's claims arise out of Shore's forum-related contacts. GER alleges breach of contract, conversion, and violations of Louisiana's Unfair Trade Practices Act. Because the communications noted above dealt primarily with the execution of a contract between the parties, and when the prior contract expired, the communications regarding the parties' respective understandings - contained in the emails - have given rise to the dispute before the Court.

Finally, the undersigned concludes that the exercise of personal jurisdiction over Shore is fair, just, and reasonable under the circumstances of this case. *Colwell Realty,* 785 F.2d at 1333, *citing Growden v. Ed Bowlin & Associates, Inc.,* 733 F.2d 1149, 1151 (5th Cir.1984). Shore did business with GER for a period of six years -- and conducted business with GER's predecessor-in-interest for approximately twenty years before that -- before the instant lawsuit was filed. Shore acknowledged the transfer of assets to GER in 2014 and continued to operate with GER on the basis of a previously-negotiated contract.

The communications between the parties show that Shore actively wanted to continue that relationship. Thus, based on its communications with GER, Shore should have reasonably anticipated being haled into court in Louisiana.

Cognizant that the inquiry before the Court is fact intensive, and after carefully considering the relevant communications between the parties, the undersigned concludes that the April 2, 2020 letter, as well as the January 27, 2019, February 26, 2019, and February 27, 2019 emails, evidence that Shore used its communications with GER to "purposefully establish[] minimum contacts with the forum." *See also Georgia Mobile,* 2018 WL 6037527 at *6 ("Napper, on behalf of CSM and MHS, contacted Plaintiffs in Louisiana by emails, telephone calls, and text messages."). Consequently, the undersigned concludes that this Court has specific jurisdiction over Shore.

### B. Venue

Shore also seeks dismissal of the instant matter under Rule 12(b)(3) arguing that venue is improper in this Court. 28 U.S.C. 1391(b) provides, in pertinent part:

A civil action may be brought in --

   **(1)** a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

   **(2)** a judicial district in which a substantial part of the events

24

> or omissions giving rise to the claim occurred, or a substantial part
> of property that is the subject of the action is situated;

Under 28 U.S.C. 139l(c)(2), for all venue purposes, "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, *if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question ... "* (emphasis added).

The undersigned has concluded that this Court has personal jurisdiction over Shore, so venue is not improper in this Court for that reason. Additionally, after a review of the evidence, the undersigned concludes that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. The undersigned has concluded that Shore directed communications to GER within this district, and that the alleged harm done to GER occurred in this district. As such, venue is proper in this Court, and for that reason, the matter cannot be dismissed under Rule 12(b)(3).

Shore advances another reason that venue is not proper in this Court, namely, that the "Terms and Conditions of Sale," which took force and effect when GER took ownership of products manufactured by Shore, mandates that litigation between the parties be filed in Pennsylvania.  The "Terms and Conditions of Sale" state as follows:

## Terms and Conditions of Sale

Shore Corporation, hereinafter "Seller"[,] manufactures and sells products to "Distributor" for resale and also directly to "End User" (collectively "Buyer"). Every purchase of a Seller product for resale by Distributor includes the obligation to communicate Seller's terms and conditions to Distributor's customer.

[ . . . ]

Disputes.

a.    Jurisdiction and Venue: Venue for any and all disputes arising from the sale of goods by Seller to Buyer or from Buyer's resale use of such goods shall be resolved in a court of competent jurisdiction in Allegheny County, Pennsylvania (PA), United States of America (USA). Buyer hereby consents to the jurisdiction of the State and Federal courts sitting in PA, appoints the Secretary of State of PA in Harrisburg, PA as its agent for service of process and agrees to appear in any proceedings upon notice thereof.

b.    Choice of Law. PA law, excluding the United Nations Convention on the international Sale of Goods or any other similar laws conventions, accord or treaties, shall apply to any dispute.

Shore argues that dismissal for improper venue is appropriate here under the forum selection clause contained in the Terms and Conditions of Sale. However, since the Supreme Court's decision in *Atl. Marine Const. Co. v. US. Dist. Court/or W Dist. a/Texas,* 571 U.S. 49, 49-50, 134 S. Ct. 568,573, 187 L. Ed. 2d 487 (2013), Rule 12(6)(3) allows dismissal only when venue is "wrong" or "improper." Whether venue is "wrong" or "improper" depends exclusively on

whether the court in which the case was brought satisfies the requirements of federal venue laws. 28 U.S.C. §1391, which governs venue generally. As the Court stated in *Atlantic Marine,*

> This question-whether venue is "wrong" or "improper"-is generally governed by 28 U.S.C. §1391 (2006 ed., Supp. V). That provision states that "[e]xcept as otherwise provided by *law* ... this section *shall* govern the venue of *all civil actions* brought in district courts of the United States."§139l(a)(l) (emphasis added). It further provides that"[a] civil action may be brought in-- (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." §1391(6). ***When venue is challenged, the court must determine whether the case falls within one of the three categories set out in §1391(b). If it does,*** venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under §1406(a). **Whether the parties *entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in §1391(b).* <u>As a result, a case tiled in a district that falls within § 1391 may not be dismissed under §1406(a) or Rule 12(b)(3).</u>**

571 U.S. at 55-56, 134 S. Ct. at 577 (emphasis added) (internal citations omitted).

As the Court has determined that venue is proper in this Court under 28 U.S.C. §1391, this matter should not be dismissed under Rule 12(b)(3). To the extent that Shore is arguing that this case should be heard in Pennsylvania

because of the forum selection clause at issue, the proper procedural vehicle for such a request is a motion to transfer under 28 U.S.C. 1404(a). Shore has not filed such a motion, and neither party has briefed the issue of either the validity or enforceability of the purported forum selection clause at issue, or the factors this Court should consider in whether to grant a motion under Section 1404(a).

Considering the foregoing, Shore's motion to dismiss GER's claims under Rule 12(b)(3) must be denied, subject to the right of Shore to re-file its request that this matter proceed in Pennsylvania under the proper procedural vehicle.

### III. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Motion to Dismiss Pursuant to Rule 12(b)(2) and Rule 12(b)(3) [Doc. 10] filed by Shore be DENIED, this Court having concluded that there is personal jurisdiction over Shore in this district, and that dismissal is improper under Rule 12(b)(3) under the facts and circumstances of this case.

Under the provisions of 28 U.S.C. § 636(b)(l)(C) and Fed.R.Civ.P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to

the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association,* 79 F.3d 1415 (5th Cir.1996).

**THUS DONE AND SIGNED** at Lafayette, Louisiana, this 26th day of January 2021.

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**